

Marian F. Harrison
US Bankruptcy Judge

Dated: 12/13/2013



# IN THE UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **IN RE:** | ) | |
| | ) | **Case No. 313-01037** |
| **BRENDA RUTH WILHOITE,** | ) | **Judge Marian F. Harrison** |
| | ) | **Chapter 13** |
| Debtor. | ) | |
| | ) | |
| | ) | |
| **FIDELITY NATIONAL TITLE** | ) | **Adv. Proc. No. 313-90099** |
| **INSURANCE COMPANY OF** | ) | |
| **NEW YORK d/b/a FIDELITY** | ) | |
| **NATIONAL TITLE INSURANCE** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **BRENDA RUTH WILHOITE,** | ) | |
| | ) | |
| Defendant. | ) | |

_____

## MEMORANDUM OPINION

_____

A hearing was held September 5, 2013, during which the Court considered the

dischargeability complaint for fraud filed under 11 U.S.C. § 523(a)(2)(A), the

allowance of and amount of the plaintiff's claim based on breach of two contracts (a promissory note and an "Indemnity Agreement" signed by the debtor and her husband), and based on negligent misrepresentation.

For the following reasons, which represent the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052, the Court finds:

1. The plaintiff's 11 U.S.C. § 523(a)(2)(A) nondischargeability action should be dismissed.

2. The plaintiff's claim, to the extent it is based on breach of the promissory note signed by the debtor, should be allowed in part.

3. The plaintiff's claim, to the extent it is based on breach of the "Indemnity Agreement," should be disallowed.

4. The plaintiff's claim, to the extent it is based on negligent misrepresentation, should be disallowed.

## I. FACTS

This adversary proceeding revolves around an Affidavit and Indemnity Agreement as to Debts, Liens and Claims (hereinafter "Indemnity Agreement") and a promissory note signed by the debtor in connection with the purchase of non-residential real property in December 2007.

As background, the plaintiff is a title insurance underwriter whose business includes issuing title insurance policies for owners and lenders designed to guard against certain adverse claims and risks outlined in the policies. To assist in the operation of its business, the plaintiff enters into Issuing Agency Agreements with title insurance agents. These Issuing Agency Agreements authorize agents to issue title insurance commitments, binders, guarantees, endorsements, and title insurance policies on the plaintiff's forms in designated territories. The plaintiff (through its predecessor) entered into an Issuing Agency Agreement dated February 29, 2000, (hereinafter "Agency Agreement") with Realty Title, an agent of the plaintiff at all times relevant to the allegations in the complaint.

Pursuant to the Agency Agreement, Realty Title issued a Loan Policy of Title Insurance (hereinafter "Policy") for the SunTrust Bank (hereinafter "SunTrust") loan at issue in the complaint and in the claim addressed in this opinion. The Policy provided insurance in connection with the Commercial Deed of Trust (hereinafter "Deed of Trust"), dated December 3, 2007, by and between the debtor, Brenda R. Wilhoite, and Murray O. Wilhoite, as Grantor, in favor of Steve Lancaster, as Trustee, for the use and benefit of SunTrust, as Beneficiary, which Deed of Trust was recorded in the Register's Office for Williamson County, Tennessee.

3 - U.S. Bankruptcy Court, M.D. Tenn.

The loan proceeds were to be used to acquire an expanded facility located at 8401 Covington Road, College Grove, Tennessee (hereinafter "Covington Road Property") for the business entity owned by the debtor and her now estranged husband, Murray O. Wilhoite, Jr. (hereinafter "husband").[1] SunTrust required additional collateral to secure the loan, and a security interest was granted in a second parcel located at 308 Century Court, Franklin, Tennessee (hereinafter "Century Court Property"), the property where the business was then operating. The Deed of Trust secured a Commercial Promissory Note payable to SunTrust in the original principal amount of $1,224,292.48. The Policy insured the Deed of Trust as a valid first priority deed of trust lien encumbering both properties.

Prior to closing and prior to issuance of the loan policy, Realty Title conducted a title search of both the Covington Road Property and the Century Court Property. The title search revealed that a "Murray Wilhoite" owned the Century Court Property. The title search did not show that title was vested in either "Murray O. Wilhoite, Jr." or the debtor. As it turned out, the "Murray Wilhoite" who owned the Century Court Property was the husband's father. He was and has been the sole and exclusive owner

_____

[1] The debtor testified that she had no interest in relocating the business and that relocation was her husband's desire.

of the property since September 1980. The title search also revealed a copy of a recorded release of lien which reflected that the wife of Murray Wilhoite was Thelma Wilhoite. The title search conducted by Realty Title contained no evidence that the debtor owned or had ever owned any interest in the Century Court Property. Robert Ames, an attorney with Realty Title (hereinafter "Mr. Ames"), testified that the search raised no red flags for Realty Title. According to Mr. Ames, Realty Title "knew that Brenda Wilhoite was Mr. Wilhoite's second wife," although this was not true. At the time the Policy was issued and the Deed of Trust was recorded, Murray O. Wilhoite and Brenda Wilhoite did not hold legal title to the Century Court Property.

Realty Title issued a title commitment which required execution and recording of the Indemnity Agreement signed by Murray Wilhoite and wife, Brenda Wilhoite, as a prerequisite to issuance of the Policy. The Indemnity Agreement signed by the debtor at closing provided that "Murray Wilhoite and wife, Brenda Wilhoite, . . . is the vested titleholder of the real property located at 308 Century Court Franklin TN, 37064." The Indemnity Agreement also provided that:

> Owner, and each of them, agrees to pay on demand, jointly and severally, to Realty Title & Escrow, Inc., its successors or assigns, or the title insurance underwriter used in this transaction, to Owner's lender, if applicable, or to the purchaser, if applicable, and/or their lender, if any, all amounts which any of them may pay or become liable to pay, including

but not limited to interest, court costs and attorneys' fees, by reason of any inaccuracies contained herein.

At the closing, Realty Title required the debtor to sign the Indemnity Agreement and the Deed of Trust to confirm the conveyance of any marital interest in the Century Court Property. Mr. Ames testified that Realty Title did not believe the debtor had an interest in the Century Court Property. Instead, he testified that it is common practice in Tennessee for title companies to require non-vested spouses to sign such documents to ensure that if there is a default, the bank can foreclose on the property without having to go to court to determine a spouse's interest in the property. The debtor testified that prior to closing her husband told her that the property had recently been transferred to him by his father. Then at closing, she was told that she might have some marital interest in the property since it was owned by her husband. She testified she had no reason to question her husband or the closing representative regarding ownership, so she signed the documents.

During the closing, Realty Title's representative was provided with drivers' licenses of Murray Wilhoite, Jr., and Brenda Wilhoite and made copies of them. Mr. Ames testified that even though the husband's driver's license indicated a variation

on the name, specifically "Jr.," it would not have raised any red flags regarding ownership of the property.

In 2011, the debtor discovered that her husband had been cheating on her with an employee. While preparing for divorce proceedings, the debtor learned that her husband did not own the Century Court Property. The debtor testified that she immediately contacted her attorney and instructed him to notify SunTrust of her discovery. On June 8, 2011, the debtor, acting through her attorney, provided SunTrust with notice of the fact that the Century Court Property was never owned by either the debtor or the husband.

After discovering that the Deed of Trust was not executed by the owner of the Century Court Property, much litigation ensued. SunTrust asserted a claim under the Policy in the summer of 2011. Thereafter, SunTrust filed a lawsuit against the plaintiff, the plaintiff filed a lawsuit against Realty Title, which was subsequently settled, and the debtor's father-in-law filed a lawsuit against the debtor, the husband, and SunTrust. SunTrust foreclosed on the Deed of Trust and conducted a foreclosure sale of the Covington Road Property on September 12, 2012. The proceeds from the sale were insufficient to satisfy the indebtedness secured by the Deed of Trust, resulting in a loss

under the Policy. Shenia Banker (hereinafter "Ms. Banker"), who is a vice president and agency manager for the plaintiff, testified that the deficiency on the Note is $512,512.03 plus attorney fees.

The testimony regarding who negotiated the loan on behalf of the borrowers was disputed. The husband testified that he had nothing to do with the loan negotiations and that the debtor was the one who worked out the loan. Rick Carrick, a former employee of SunTrust, testified that to his knowledge, the debtor was the primary contact on the loan. However, he could only remember meeting with the debtor once in the office of Carol Hargis, another SunTrust employee, and at the closing. He could not remember any representations regarding the Century Court Property made by the debtor or any other conversations with the debtor. No other SunTrust employees testified. The debtor testified that she made the initial contact with someone at SunTrust but that her husband took over the negotiations thereafter because he was the one interested in moving the business to the Covington Road Property.

## II. **PRELIMINARY MATTER**

Prior to trial, the plaintiff filed a motion in limine to exclude evidence, testimony, or argument regarding testimony or otherwise referencing the document titled

"Settlement Agreement and Release" (hereinafter "Agreement") between the plaintiff and Realty Title. Specifically, the plaintiff asserts that the Agreement has no relevance to the present adversary because it is merely a business arrangement between the plaintiff and Realty Title.

As a general rule, evidence should be excluded on a motion in limine only when it is clearly inadmissible. *Indiana Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004) (citation omitted). Pursuant to Fed. R. Evid. 402, irrelevant evidence is not admissible, whereas relevant evidence is admissible with certain exceptions. "Relevant evidence" is defined in Fed. R. Evid. 401 as evidence having "any tendency to make a fact more or less probable than it would be without the evidence" and where "the fact is of consequence in determining the action." While the relevancy standard is liberal, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 587 (1993), relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Ultimately, the decision whether to grant or deny a motion in limine is within the sound discretion of the trial court. *Goldman v. Healthcare Mgmt. Sys., Inc.,* 559 F. Supp. 2d 853, 858 (W.D. Mich. 2008) (citation omitted).

Here, the Agreement was the result of a Chancery Court lawsuit the plaintiff filed against Realty Title, asserting negligence, breach of contract, indemnification, negligent misrepresentation, and breach of fiduciary duty in relation to issuing the Policy on the SunTrust loan. In June 2013, the Agreement was executed by the plaintiff and Realty Title because "the Parties desire to settle the issues raised, or that could have been raised, in the Lawsuit, the SunTrust Claim, or both, without further expenditure of time and expense." Pursuant to the terms of the Agreement, Realty Title agreed "to remit to Fidelity Fifteen Thousand Dollars and Zero Cents ($15,000.00) per month in premiums charged to third-party customers on Fidelity's behalf. . . . This agreement shall continue for a period of thirty-six (36) months, from July 1, 2013, through June 30, 2016 ("Time Period"), or until [Realty Title] remits a total of Five Hundred Forty Thousand Dollars and Zero Cents ($540,000.00)." Thereafter, the Chancery Court entered an order of compromise and dismissal of the lawsuit on July 1, 2013.

The Court agrees with the plaintiff that the Agreement is not relevant to the plaintiff's claims of tort and fraud. It is relevant, however, to the plaintiff's breach of contract claim. As this Court noted in *Tyree v. Shrum (In re Shrum),* No. 309-0259A, 2010 WL 4961808, (Bankr. M.D. Tenn. Dec. 1, 2010), "[i]n Tennessee, the collateral source rule, which prevents a tortfeasor from reducing his damages payable

by amounts the plaintiff has received from sources other than the tortfeasor, has no application in contractual, quasicontractual, or equitable contract-like claims." *Id.* at *3 (citations omitted).

Despite the plaintiff's assertion that the Agreement is merely a business arrangement, it clearly was entered into as a settlement of the plaintiff's claims against Realty Title for its role in issuing the Policy on the SunTrust loan. Accordingly, the Court finds that evidence, testimony, or argument regarding testimony or otherwise referencing the Agreement is relevant in the limited context of the plaintiff's assertion of breach of contract as a basis for its claim.

# III.  **DISCUSSION**

## A. **DISCHARGEABILITY**

Generally, exceptions to discharge are to be construed strictly against the creditor. *Gleason v. Thaw*, 236 U.S. 558, 562 (1915).  The burden of proof falls upon the party objecting to discharge to prove by a preponderance of the evidence that a particular debt is nondischargeable. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

Section 523(a)(2)(A) denies discharge of a debt:

for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

The Sixth Circuit has held that in order to except a debt from discharge under 11 U.S.C. § 523(a)(2)(A), a creditor must prove the following elements:

(1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth;

(2) the debtor intended to deceive the creditor;

(3) the creditor justifiably relied on the false representation; and

(4) its reliance was the proximate cause of loss.

12 - U.S. Bankruptcy Court, M.D. Tenn.

*Rembert v. AT & T Universal Card Servs., Inc. (In re Rembert),* 141 F.3d 277,

280-281 (6th Cir. 1998) (citation omitted).


### 1. <u>Material False Representation Made Intentionally<br>or with Gross Recklessness</u>

For the purposes of 11 U.S.C. § 523(a)(2), a statement is materially false if it

"contains an important or substantial untruth. The measuring stick of material falsity

is whether the [creditor] would have made the loan if the debtor's true financial

condition had been known." *First Nat'l Bank of Centerville, Tenn. v. Sansom (In re*

*Sansom),* 224 B.R. 49, 54 (Bankr. M.D. Tenn. 1998) (citations omitted).


Clearly here there was a material misrepresentation as to ownership of the

Century Court Property: to wit, that the debtor and her husband owned the Century

Court Property. While the debtor's ownership was not a material misrepresentation,

since no one representing the plaintiff or SunTrust believed she owned the Century

Court Property, she was required to sign the closing documents to ensure against any

"marital" interest she might later be deemed to have, the representation that her

husband owned the property is material.

While the statement regarding her husband's ownership is material, there is no credible proof that the debtor knew that her statement was false or that she acted with gross recklessness as to its falsity. The debtor clearly and reasonably believed that her husband, whom she understandably trusted, owned the Century Court Property. The debtor, whose testimony was very credible, stated that her then trusted husband told her that his father had transferred the Century Court Property to him, and this statement was confirmed to her when Realty Title performed the requisite title search and failed to advise her at the closing that her husband did not own the property. There was simply no credible proof that the debtor knew her husband did not own the property. Accordingly, the plaintiff has failed to establish the first element required under 11 U.S.C. § 523(a)(2)(A).

### 2. Intent to Deceive

To prevail on the second element of its claim, the plaintiff must prove that the debtor intended to deceive. "A debtor intends to deceive a creditor 'when the debtor makes a false representation which the debtor knows or should have known would induce another to advance goods or services to the debtor.'" *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 765-66 (Bankr. E.D. Tenn. 2003) (citations omitted). The trier of fact "must consider whether the totality of the circumstances 'presents a picture

14 - U.S. Bankruptcy Court, M.D. Tenn.

of deceptive conduct by the debtor which indicates an intent to deceive the creditor.'"
***Id.*** at 766 (citation omitted).  Any benefit of the doubt must be resolved in favor of the
debtor.  ***XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.),*** 16 F.3d 1443,
1452 (6th Cir. 1994) (citation omitted).

In this case, the Court finds that the debtor is entitled to the benefit of the doubt.
There was no proof that the debtor intended to deceive.  Mr. Carrick, a former
SunTrust employee, was the only SunTrust representative who testified, and he could
not remember any representations regarding the Century Court Property or any other
conversations with the debtor except for one meeting with the debtor in the office of
Ms. Hargis (who did not testify), and at the closing.  Even the husband, whose
testimony was far less credible than the debtor's, testified that he "could see" how the
debtor might have gotten the wrong impression about who owned the property.  Again,
the debtor was a very credible witness, and the Court finds that the debtor honestly
believed that her husband owned the property.  Clearly, the party with the requisite
intent to deceive was her husband, who wanted the new property.  Accordingly, the
Court finds that the plaintiff has failed to establish the second element of 11 U.S.C. §
523(a)(2)(A).

### 3. Justifiable Reliance

To prevail on the third element of its claim, the plaintiff must prove that it actually relied on the debtor's representations and, based upon the facts and circumstances known to it at the time, that its reliance was justifiable. *In re Copeland*, 291 B.R. at 767. *See also Field v. Mans,* 516 U.S. 59, 70-71 (1995) (adopting lower subjective standard of justifiable reliance as opposed to objective standard of reasonable reliance). A creditor will be found to have justifiably relied on a representation even where that creditor "'might have ascertained the falsity of the representation had he made an investigation.'" *In re Copeland*, 291 B.R. at 767 (citations omitted). At the same time, reasonableness is still relevant, in that, " the greater the distance between the reliance claimed and the limits of the reasonable, the greater the doubt about reliance in fact." *Field v. Mans,* 516 U.S. at 76. In other words, "[t]he subjectiveness of justifiability cuts both ways, and reasonableness goes to the probability of actual reliance." *Id.*

There is no proof that the plaintiff actually relied on any statements made by the debtor. Mr. Ames testified that the debtor was a non-vested spouse and that spouses were routinely asked to sign the loan documents in case of any future issue regarding marital interest in the property. Realty Title never found any evidence that the debtor

16 - U.S. Bankruptcy Court, M.D. Tenn.

owned or had ever owned any interest in the Century Court Property. There is no justification for relying on the debtor's signature on the loan documents which Realty Title prepared and asked her to sign, knowing full well that she had no vested ownership in the property.

In addition, red flags in the title search were ignored. As alleged by the plaintiff in its state lawsuit against Realty Title, the "title search of [the Century Court Property] conducted by Realty Title showed that title was not vested in Murray Wilhoite, Jr. or Brenda Wilhoite, particularly when read in conjunction with the documents in Realty Title's files." One of those documents was a copy of a recorded release of lien which reflected that the wife of Murray Wilhoite, the owner of the Century Court Property, was Thelma Wilhoite and not Brenda Wilhoite. Mr. Ames testified that Realty Title knew that the debtor was the husband's second wife so the listing of Thelma Wilhoite was not a red flag. However, Mr. Ames never explained why he thought the debtor was the husband's second wife or whether this fact was ever verified. Moreover, the debtor testified that her husband had not previously been married and that Thelma Wilhoite was her mother-in-law.

17 - U.S. Bankruptcy Court, M.D. Tenn.

Another red flag occurred at closing when Realty Title was provided with a copy of the driver's licenses of the debtor and the husband. The driver's license of the husband reflected that Murray O. Wilhoite, Jr., was the person executing the insured deed of trust at the closing. While Mr. Ames correctly testified that "Jr." is not a legal name, the inclusion of Jr. on the driver's license raises the possibility that more than one person holds that name and that further investigation is warranted, especially when combined with the fact that the name of the wife signing the documents was Brenda rather than Thelma. It would have taken only minimal investigation (i.e. a direct question to Murray O. Wilhoite, Jr.) to confirm that the vested title owner was not present at closing and that Murray O. Wilhoite, Jr. was not the Murray Wilhoite who owned the Century Court Property.

Accordingly, the proof does not support a finding that the plaintiff relied on the debtor's statements, and even if it did, such reliance was not justified.

### 4. <u>Proximate Cause</u>

It follows that the plaintiff has not established the fourth element necessary to declare a debt non-dischargeable under 11 U.S.C. § 523(a)(2)(A). This requires a "'direct link between the alleged fraud and the creation of the debt.'" ***In re Copeland***,

291 B.R. at 767 (citation omitted). The proximate cause of the plaintiff's loss is not anything the debtor stated or signed. If anything, the proximate cause is attributable to the statements of her husband who knew that he did not own the Century Court Property together with the failure of the plaintiff's agent, Realty Title, to properly determine the owner and heed the red flags presented to it. The latter is consistent with the allegations contained in the plaintiff's lawsuit against Realty Title, where it asserted that "[t]he actions and omissions of Realty Title constitute negligence and are the direct and proximate cause of an[y] damage sustained by Fidelity."

Accordingly, the Court finds that any debt owed to the plaintiff is dischargeable.

## B. ISSUES REGARDING ALLOWANCE & AMOUNT OF CLAIM

The plaintiff asserts a claim for $701,960.89 ($512,512.03, the deficiency on the note, plus $189,448.86 in attorneys' fees) for breach of the promissory note and the Indemnity Agreement, or, in the alternative, a claim of $441,448.86 ($227,500 paid to SunTrust plus $24,500 in expenses plus $189,448.86 in attorneys' fees) for breach of and negligent misrepresentations in the Indemnity Agreement. Based on the proof, the Court finds that the only viable basis for its claim against the debtor is for breach of the promissory note.

# 1. Breach of Contract

In Tennessee, a breach of contract claim includes the following elements: "'(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach.'" ***ARC LifeMed, Inc. v. AMC–Tenn., Inc.,*** 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005) (citations omitted).

In the present case, the debtor signed the promissory note as one of the borrowers, she did not repay the loan, and the result was a deficiency under the note in the amount of $512,512.03. This is not an issue of credibility. The debtor signed a promissory note agreeing to pay back the loan, and the agreement to pay is independent from whether or not she believed her husband owned the Century Court Property. This does not end the analysis. As discussed earlier, the Agreement with Realty Title is relevant to the breach of contract claim.

Under the Agreement, Realty Title agreed to remit $15,000 a month in premiums to the plaintiff for a period of three years or until Realty Title had remitted a total of $540,000. Ms. Banker, a vice president and agency manager for the plaintiff, testified that in the two prior years, Realty Title remitted an average of $49,000 in premiums and that the Agreement increased the amount of remitted premiums by approximately

$130,000. Ms. Banker further testified that approximately 60% of the remitted premiums, or $78,000 per year, represented additional profits to the plaintiff. It is these increased profits that must be deducted from any amount collected from the debtor because they would not have been earned but for the "Settlement." Based on the Court's calculations, Realty Title will have paid the plaintiff additional profits in the amount of $234,000 for its role in issuing the Policy on the SunTrust loan. Therefore, the plaintiff's breach of contract claim must be reduced by this amount. Accordingly, the Court finds that the plaintiff's allowed breach of contract claim is $278,512.03.

### 2. <u>Breach of Indemnity Agreement</u>

The indemnification provision in the Indemnity Agreement provided:

> Owner, and each of them, agrees to pay on demand, jointly and severally, to Realty Title & Escrow Company, Inc., its successors or assigns, or the title insurance underwriter used in this transaction, or Owner's lender, if applicable, or to the purchaser, if applicable, and/or their lender, if any, all amounts which any of them may pay or become liable to pay, including but not limited to interest, court costs and attorneys' fees, by reason of any inaccuracies contained herein.

In the plaintiff's complaint against Realty Title, the plaintiff acknowledged "[t]he actions and omissions of Realty Title constitute negligence and are the direct and proximate cause of an[y] damage sustained by [the plaintiff]."

Under Tennessee law, "an indemnity agreement does not indemnify the indemnitee's own negligence unless it is clear and unambiguous from the language of the contract that this was the intention of the parties." *Amerco Mktg. Co. of Memphis, Inc. v. Myers,* 494 F.2d 904, 913 (6th Cir. 1974) (citations omitted). Tennessee recognizes that "there can be no recovery where there was concurrent negligence of both indemnitor and indemnitee unless the indemnity contract provides for indemnification in such case by 'clear and unequivocal terms.'" *The Kroger Co. v. Giem,* 387 S.W.2d 620, 626 (Tenn. 1965) (citations omitted). *See also Pitt v. Tyree Org. Ltd.*, 90 S.W.3d 244, 253 (Tenn. Ct. App. 2002) ("[i]t is not against public policy to contract to be indemnified against one's own negligence, but such a provision in indemnification contracts must be expressly clear and in unequivocal terms") (citations omitted).

Here, the Indemnity Agreement did not contain any provision making the indemnitor liable for the indemnitee's negligence. Accordingly, under Tennessee law, the debtor would only be liable under the Indemnity Agreement if the plaintiff became liable because of her inaccuracies, not Realty Title's negligence. Here, there is absolutely no proof that the plaintiff relied on the debtor's signature of the Indemnity Agreement or that her signature directly led to the plaintiff's loss. As discussed

22 - U.S. Bankruptcy Court, M.D. Tenn.

throughout this opinion, it was the plaintiff and its agent, Realty Title, who ignored red flags regarding ownership, and it was the plaintiff and its agent, Realty Title, who wanted the debtor's signature just because they believed she was a non-vested spouse. Even if the plaintiff and its agent, Realty Title, were not the real cause of liability, it is clear that the husband, whose credibility was sorely lacking,[2] was the one who knowingly made the misrepresentations, and it was his misrepresentations that the plaintiff ultimately believed and relied upon.[3]

### 3. Negligent Misrepresentation Claim

Under Tennessee law, to prove negligent misrepresentation, the plaintiff must show:

> (1) the defendant is acting in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary (as opposed to gratuitous) interest; *and*

> (2) the defendant supplies faulty information meant to guide others in their business transactions; *and*

---

[2]In addition to the husband's lack of credibility regarding the events surrounding this adversary proceeding, cross-examination showed significant misrepresentations on the statements and schedules in his own bankruptcy, which he claimed not to have read before his attorney filed them with the Court.

[3]The plaintiff seeks attorney fees and court costs based on the Indemnity Agreement. Because the Court finds that the debtor is not liable under the Indemnity Agreement, the plaintiff is not entitled to recover attorneys' fees and other costs incurred.

23 - U.S. Bankruptcy Court, M.D. Tenn.

(3) the defendant fails to exercise reasonable care in obtaining or communicating the information; *and*

(4) the plaintiff justifiably relies upon the information.

*John Martin Co., Inc. v. Morse/Diesel, Inc.,* 819 S.W.2d 428, 431 (Tenn. 1991) (emphasis in original).

The Court has already found that the proof does not support a finding that the plaintiff relied on the debtor's statements, and that even if it did, such reliance was not justified. Moreover, the debtor had no reason to question her then trusted husband regarding ownership of the Century Court Property. Accordingly, the plaintiff's claim against the debtor for negligent misrepresentation must be denied.

## IV. CONCLUSION

Accordingly, the Court finds as follows:

1.  The plaintiff's claim against the debtor is dischargeable.

2.  The plaintiff's claim, to the extent it is based on breach of the promissory note should be allowed in the amount of $278,512.03.

3.  The plaintiff's claim, to the extent it is based on breach of the indemnity agreement, should be disallowed.

4.  The plaintiff's claim, to the extent it is based on negligent misrepresentation, should be disallowed.

An appropriate order will enter.

**This Memorandum Opinion was signed and entered electronically as indicated at the top of the first page.**

This Order has been electronically
signed. The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.